RECEIVED THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
2005 OCT 19 A 11: 54          SOUTHERN DIVISION

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT,
MIDDLE DISTRICT ALA

| | |
|---|---|
| JEWELL FRANKLIN OWEN, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS ) | CASE NO: 1:05CV1000-T |
| ) | |
| KENWORTH OF DOTHAN, INC., ) | |
| ) | |
| DEFENDANT. ) | |

---

**MOTION TO STAY ACTION AND REQUIRE PLAINTIFF
TO SUBMIT HER DISPUTES TO BINDING ARBITRATION
PURSUANT TO THE PROVISIONS OF 9 U.S.C. SECTION 1, ET SEQ.**

---

Defendant, Kenworth of Dothan, Inc. ("Kenworth"), respectfully requests this Honorable

Court to enter an Order requiring the Plaintiff to submit her disputes to binding arbitration, pursuant

to the provisions of the written agreement to arbitrate made a part of the purchase transaction and

in accordance with the provisions of the Federal Arbitration Act, 9 U.S.C. §1, et seq. and in support

thereof states as follows:

I.    THE DEFENDANT HAS SUBMITTED A PRIMA FACIE CASE FOR THE
      ENFORCEMENT OF THE ARBITRATION AGREEMENT.

As will be demonstrated infra, the transaction in which the Plaintiff's claims originate

involves interstate commerce sufficiently to invoke the Federal Arbitration Act, which preempts any

Alabama public policy against the specific enforcement of a pre-dispute arbitration agreement.

Additionally, the Plaintiff is bound to an arbitration agreement with the Defendant, and the claims asserted in her complaint are covered thereby.  As such, the Defendant has submitted a prima facie case for the enforcement of the arbitration agreement.

A.    **The transaction at issue involves interstate commerce.**

A written agreement, which contains specific provisions requiring the arbitration of disputes between parties and which involves or affects interstate commerce, is specifically enforceable under the Federal Arbitration Act.  <u>Allied-Bruce Terminix Cos. v. Dobson</u>, 513 U.S. 265 (1995).

The United States Supreme Court has identified three broad categories of activity that Congress may regulate pursuant to its commerce power.  <u>U.S. v. Lopez</u>, 514 U.S. 549, 558 (1995). First, Congress may regulate the use of the channels of interstate commerce.  <u>Id</u>.  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.  <u>Id</u>. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e. those activities that substantially affect interstate commerce.  <u>Id</u>. at 558-59.

B.    **The subject of the transaction at issue was an instrumentality of interstate commerce.**

The subject of the transaction at issue in this case is Plaintiff's purchase of a used 1998 Kenworth T600 Tractor/Truck. (Affid. of Robert Mitchell, attached hereto as Exhibit 2; Plaintiffs' Complaint) Attached hereto as Exhibit 1 is a copy of the buyers order executed by Jewel Dean Oliver.

In the present age, motor vehicles represent Americans' primary mode of transportation both within and among the States. U.S. v. Bishop, 66 F.3d 569, 590 (3rd Cir. 1995). Commuters, salespeople, and haulers rely upon motor vehicles daily to maintain the flow of commerce. Id. Accordingly, given the importance of the automobile and its inherent mobility, it has been held that a motor vehicle is an **instrumentality** of interstate commerce. Bishop, 66 F.3d at 590. In Bishop, the Third Circuit Court of Appeals was called upon to determine whether Congress exceeded its constitutional authority in enacting a federal law; at issue was the power of Congress to criminalize "carjacking," which is the armed theft of an automobile from the presence of another by force and violence or by intimidation. 66 F.3d at 571. Congress believed that it had the power to criminalize the carjacking of an motor vehicle that had been transported, shipped, or received in interstate or foreign commerce, and it consequently enacted 18 U.S.C. § 2119 to do just that. Id. The defendants in Bishop, who had appealed their convictions under the federal carjacking statute, argued that Congress had exceeded its power under the Commerce Clause of the United States Constitution. Id.; U.S. Const. Art. I, § 8, cl. 3.[1] Among others, the government argued that the statute passed

---

[1] The Third Circuit decided Bishop in the aftermath of the United States Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), and the Third Circuit was mindful of the implications of the decision in Lopez in its deliberations with respect to the "effects" test. 66 F. 3d at 575. However, Lopez did not affect the Third Circuit's analysis of whether a motor vehicle was an instrumentality of interstate commerce because the "effects" test has no role

constitutional muster under the second category identified in <u>Lopez</u>, i.e. that Congress can regulate instrumentalities of interstate commerce and persons and things in interstate commerce, because a motor vehicle was a quintessential instrumentality of modern interstate commerce. <u>Bishop</u>, 66 F. 3d at 588.

In reaching a decision, the court in <u>Bishop</u> acknowledged that the United States Supreme Court had made clear that airplanes, railroads, highways, and bridges constitute instrumentalities of interstate commerce which Congress can regulate under the Commerce Clause. 66 F.3d at 588, citing <u>Lopez</u>, 514 U.S. at 557 (airplanes); <u>Shreveport Rate Cases</u>, 234 U.S. 342 (1914) (railroads); <u>Alstate Constr. Co. v. Durkin</u>, 345 U.S. 13 (1953) (highways); <u>Overstreet v. North Shore Corp.</u>, 318 U.S. 125 (1943) (intrastate bridge over navigable waterway). The court further acknowledged that Congress may regulate threats to these instrumentalities even though the threat may come only from intrastate activities. <u>Bishop</u>, 66 F.3d at 588. The court compared motor vehicles to the recognized instrumentalities of interstate commerce:

> Instrumentalities differ from other objects that affect interstate commerce because they are used as a means of transporting goods and people across state lines. Trains and planes are inherently mobile; highways and bridges, though static, are critical to the movement of automobiles. It would be anomalous, therefore, to recognize these categories of instrumentalities but to suggest that the similarly mobile automobile is not also an instrumentality of interstate commerce.

<u>Bishop</u> 66 F.3d at 588.

---

outside of cases involving intrastate activities that are regulated because of their substantial effects upon interstate commerce. <u>Bishop</u>, 66 F.3d at 588 fn. 29, <u>citing</u> <u>U.S. v. Robertson</u>, 514 U.S. 669 (1995).

The fact that the vehicle made the subject of this suit could theoretically be used solely for intrastate purpose does not withdraw it from Congress' Commerce Clause power. The court in Bishop acknowledged that none of the instrumentalities with which it compared the automobile were used *exclusively* as conduits for *interstate* traffic and that, nonetheless, said items were still instrumentalities of interstate commerce. 66 F.3d at 588. Based thereon, the court rejected the argument that because automobiles are often used for intrastate travel they are different from other instrumentalities. Id. at 589.

It is unnecessary to demonstrate that an item was actually being used in interstate commerce for it to be an instrumentality thereof. The court in Bishop rejected the argument that Congress could only regulate motor vehicles as instrumentalities of interstate commerce when such vehicles were *actually* traveling in interstate commerce, relying upon Southern Ry. Co. v. United States, 222 U.S. 20 (1911), in which the Supreme Court rejected the same distinction between vehicles that are traveling in interstate commerce and vehicles, which though capable of interstate travel, are traveling intrastate when regulated. Bishop, 66 F.3d at 589. In Southern Ry. Co., the United States Supreme Court recognized that Congress had the power to regulate boxcars that traveled exclusively intrastate because of their inherent mobility and connection to interstate commerce. 222 U.S. at 27. In the Shreveport Rate Cases, 234 U.S. 342 (1914), the United States Supreme Court recognized Congress' power to regulate rates for completely intrastate rail trips, and in Overstreet v. North Shore Corp., 318 U.S. 125 (1943), the Supreme Court found that a wholly intrastate bridge that connected an island to an interstate highway was an instrumentality of interstate commerce despite the fact that goods, when they traveled over the bridge, necessarily traveled in intrastate commerce. The court

in <u>Bishop</u> found both of these decisions to be persuasive. 66 F.3d at 589. Congress' power to regulate instrumentalities is not a power to regulate vehicles only when those instrumentalities are actually being used in interstate commerce; instead, this power derives from the objects' *status* as instrumentalities. <u>Bishop</u>, 66 F.3d at 589.

The arbitration agreement at issue in this case was executed in connection with the purchase of a motor vehicle, the intended purpose of which was to be operated in a commercial enterprise. (Exhibit A). The arbitration agreement is found within the buyers order. (Exhibit A) Because this transaction involved an instrumentality of interstate commerce, which was well within the power of Congress to regulate under the Commerce Clause, the Federal Arbitration Act applies to the arbitration agreement made the subject of the Defendant's motion.

The complaint asserts relief against the Defendant under a federal law (The Information and Cost Savings Act) promulgated pursuant to Congress' Commerce Clause powers.

C.    **The transaction at issue involved persons and things within the flow of interstate commerce.**

In describing Congress' power to regulate people and things moving in interstate commerce, the United States Supreme Court has referred to the "flow" or "current" of activity. <u>Gulf Oil Corp. v. Copp Paving Co.</u>, 419 U.S. 186, 195 (1974); <u>Walling v. Jacksonville Paper Co.</u>, 317 U.S. 564 (1943); <u>Swift & Co. v. United States</u>, 196 U.S. 375 (1905). This flow includes the practical, economic continuity in the generation of goods and services for interstate markets and their transport

and distribution to the consumer. Selma Medical Center, Inc. v. Fontenot, 824 So. 2d 668 (Ala. 2001). A corporation is engaged in commerce when it is itself directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce. United States v. Robertson, 514 U.S. 669, 672 (1995).

The affidavit of Robert Mitchell demonstrates that the transaction made the subject of this suit involved persons and things within the "flow" or "current" of interstate commerce. For example, the vehicle was manufactured outside of the State of Alabama, and, then shipped to Alabama where it was then sold to the Plaintiff. (Exhibit A) Because of these facts, this transaction involved persons and things within the flow or current of interstate commerce, and the Federal Arbitration Act applies to the agreement at issue.

Although the Court in Sisters of the Visitation v. Cochran Plastering Co., 775 So. 2d 759 (Ala. 2000), held that evidence that a party purchases materials or equipment for construction in Alabama from a company in Alabama which does business with or receives supplies or equipment from a company outside Alabama does not alone establish that the construction in Alabama substantially affects interstate commerce, the Alabama Supreme Court has held since then that the analysis from Sisters does not apply *to persons or things in the flow or current of interstate commerce.* Selma Medical Center, Inc., 824 So. 2d 668 (Ala. 2001). Similarly, the United States Supreme Court has held that the "affecting commerce" test was developed to define the extent of Congress' power over purely intrastate commercial activities that nonetheless have substantial

7

interstate effects; it does not apply to circumstances involving the production, distribution, or acquisition of goods or services in interstate commerce. Robertson, 514 U.S. at 671.

The "come to rest" doctrine recognized in Kampis v. Yarbrough, 826 So. 2d 819 (Ala. 2002), is similarly inapplicable. The evidence submitted by the defendant in Kampis was insufficient to demonstrate the involvement of interstate commerce for the following reasons:

> None of the evidence submitted by the defendants establishes that the materials used to build the Kampis house were shipped from out-of-state. At most, the defendants' evidence establishes that the defendants purchased materials and equipment from various stores located in Alabama and owned or operated by suppliers and distributors which also do business in other states and do interstate business, although not necessarily in the materials or equipment used for Kampis's house. For aught that appears from the defendants' evidence, the materials and equipment used in the construction of the Kampis house originated solely in Alabama and never traveled outside Alabama. Although the stores in Alabama which supplied the defendants with materials and equipment to construct Kampis's house may receive materials and equipment from sources outside Alabama, the evidence does not prove that such materials and equipment were acquired for the construction of Kampis's house or were used in the construction of the house. Thus, the defendants have failed to make a prima facie showing that the construction of Kampis's house substantially involved or affected interstate commerce.

Id. at 822. However, in this case, the evidence demonstrates that the vehicle was first manufactured outside of the State of Alabama and eventually shipped into Alabama where it was sold to the Plaintiff. (Exhibit A)

Accordingly, the transaction at issue involved persons and things within the flow or the current of interstate commerce, and the Federal Arbitration Act is applicable to this inquiry.

**D.    The transaction at issue substantially affected interstate commerce.**

Congress' commerce authority includes the power to regulate those intrastate activities having a substantial relation to interstate commerce, i.e. those activities that substantially affect interstate commerce. Lopez, 514 U.S. at 558-59; Selma, supra. Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations. Hodel v. Virginia Surface Mining and Reclamation Association, Inc., 452 U.S. 264, 277 (1981); McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 241(1980)("The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities, while wholly local in nature, nevertheless substantially *affect* interstate commerce.").[2]

The gross domestic product for the United States in the year 2000 was $9,872,900,000,000; of that figure, $346,800,000,000 represented the personal consumption of motor vehicles and parts, which represented approximately three and one-half percent of the gross domestic product and approximately forty-two percent of personal consumption of durable goods.    (Exhibit A) Accordingly, it is easy to see the substantial effect upon interstate commerce of transactions similar to the one at issue in this suit.

---

[2]Even after the decision in Lopez, the analysis first set forth in Wickard v. Filburn, 317 U.S. 111, 127-28 (1942), is still applicable to this category of activity. Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine, 520 U.S. 564, 586 (1997)("And, although the summer camp involved in this case may have a relatively insignificant impact on the commerce of the entire Nation, the interstate commercial activities of nonprofit entities as a class are unquestionably significant.").

**E.    The effect of the Federal Arbitration Act upon the instant inquiry.**

When Congress passed the Federal Arbitration Act in 1925, it was motivated first and foremost by a desire to change the anti-arbitration rule which prevailed in most states. Dobson, 513 U.S. 265 (1995) (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220 (1985)). Indeed, the purpose of the Federal Arbitration Act was to ensure judicial enforcement of privately made agreements to arbitrate. Dean Witter, 470 U.S. at 219; see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991); Scherk v. Alberto-Culver Co., 417 U.S. 506, 510 n.4 (1974). As recognized by the United States Supreme Court, the problems Congress faced were twofold: (1) the old common-law hostility toward arbitration, and (2) the failure of state arbitration statutes to mandate enforcement of arbitration agreements. Southland Corp. v. Keating, 465 U.S. 1, 14 (1984). The Federal Arbitration Act sought to place an arbitration agreement upon the same footing as other contracts. Allied-Bruce Terminix, supra; Dean Witter Reynolds, supra (quoting H.R. Rep. No. 96, 68th Cong., lst Sess. 1 (1924)).

The primary substantive provision of the Federal Arbitration Act is Section 2, which provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause only upon such grounds as exist at law or in equity for the revocation of any contract. Allied-Bruce Terminix Companies. Inc. v. Dobson, 513

U.S. 265, 282 (1995). What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. Id. The Federal Arbitration Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal footing, directly contrary to the Act's language and Congress' intent. Id.

Consequently, any Alabama statute which prohibits the enforcement of predispute arbitration agreements is preempted by the Federal Arbitration Act in transactions substantially involving and affecting interstate commerce.

**F.     The Plaintiff is bound to the arbitration agreement.**

The Defendant has the burden, as the party moving to compel arbitration, of demonstrating a written agreement obligating the Plaintiff to arbitrate. Blatt v. Shearson Lehman/American Express, Inc., 1985 WL 2029 (S.D.N.Y. 1985). The Defendant has satisfied that burden by submitting substantial evidence to the trial court that the Plaintiff entered into a written agreement to arbitrate disputes. See Scone Investements, L.P. v. American Third Market Corporation, 992 F.Supp. 378 (S.D.N.Y. 1998); Blatt, supra.

**G.     The arbitration agreement covers the claims asserted.**

When determining the scope of an arbitration provision, the trial court must look to the factual allegations of the complaint and determine whether the claims alleged therein touch and

concern matters covered by the arbitration provisions. See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 45 (2d Cir. 1993); Genesco, Inc. v. T.Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987); Costle v. Freemont Indem. Co., 839 F.Supp. 265 (D.Vt. 1993). However, "due regard must be given to the federal policy favoring arbitration, and **ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration**." Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 475 (1989)(emphasis added). **All coverage doubts should be resolved in favor of coverage under the arbitration agreement**. A T & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).

In construing arbitration clauses, courts have, at times, distinguished between broad clauses, that purport to arbitrate all disputes arising out of a contract, from narrow clauses that limit arbitration to specific disputes. McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F. 2d 825, 832 (2d Cir. 1988). **Where a Court concludes that a clause is broad, the federal presumption in favor of arbitration applies with even greater force**. AT&T Technologies, Inc. v. Communications Workers of America, 475 US 643, 650 (1986).

A fair reading of the arbitration agreement submitted herewith demonstrates that it is extremely broad. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), the United States Supreme Court specifically held that an arbitration clause employing terms similar to those as set forth in the arbitration agreements submitted to the trial was "broad." Similar, yet more

12

restrictive arbitration provisions have been held to be expansive and "reach[ing] all disputes having their origin or genesis in the contract whether or not they implicated the interpretation of the performance of the contract per se." <u>Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International,</u> 1 F.3d 639, 642 (7th Cir. 1993) (holding that language "arising out of" is expansive in scope); <u>Michelle Amoruso E Figli v. Fisheries Dev. Corp.,</u> 499 F. Supp 1074, 1080 (S.D.N.Y. 1980) (noting that the clause "arising out of or relating to this agreement," has been labeled a broad arbitration clause).

The Plaintiff's claims relate to the alleged failure of the Defendant to properly disclose the odometer reading on the tractor/truck purchased, in connection with the provisions of The Information and Cost Savings Act, and representations made during the purchase of the T-600 tractor/truck. Because the arbitration agreement covers any dispute arising out of or from the purchase transaction, these claims are all clearly covered by the agreement.

Accordingly, given all of these factors, the Defendant has clearly submitted a prima facie case for the enforcement of the arbitration agreement.

## II.    CONCLUSION.

For the reasons set forth herein, this Court should grant the Defendant's motion to stay the action and require the Plaintiff to submit her disputes to binding arbitration pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, <u>et seq</u>.

Respectfully submitted,

_____
John Martin Galese, ASB-5382-E61J
Attorney for Defendant

OF COUNSEL:

GALESE & INGRAM, P.C.
300 First Commercial Bank Building
800 Shades Creek Parkway
Birmingham, Alabama 35209
(205) 870-0663

## CERTIFICATE OF SERVICE

I hereby certify that I have mailed a copy of the above and foregoing document upon all counsel of record in this cause, U.S. Mail, postage prepaid, to their proper office addresses, as shown below, on this the 19 day of October, 2005.

Joseph W. Lewis, Esq.
John E. Byrd, Esq.
P.O. Box 536
Dothan, Alabama 36302

_____
OF COUNSEL

14